IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARIO MERINO,

      Petitioner,

      v.

MARION SPEARMAN, Warden,

      Respondent.[1]

Case No.: C 08-3231 CW (PR)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; GRANTING, IN PART, CERTIFICATE OF APPEALABILITY

Petitioner Mario Merino, a California prisoner at Correctional Training Facility at Soledad, filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his state conviction, in which he asserted three claims: (1) violation of Doyle v. Ohio, 426 U.S. 610 (1976); (2) violation of Griffin v. California, 380 U.S. 609 (1965); and (3) ineffective assistance of counsel.  Respondent filed an answer and a memorandum of points and authorities in support thereof.  On May 6, 2010, the Court granted Petitioner's motion to stay his petition and hold it in abeyance so that he could exhaust a Brady claim in state court.  On October 4, 2011,

---

[1] In accordance with Habeas Rule 2(a) and Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute Warden Marion Spearman as Respondent because he is Petitioner's current custodian.

Petitioner filed a motion to lift the stay and for leave to file an amended petition.  The Court granted this motion.  On March 12, 2012, Respondent filed his supplemental response and, on March 22, 2012, Petitioner filed his supplemental traverse.  For the reasons discussed below, the Court DENIES the petition and the amended petition and GRANTS, IN PART, a certificate of appealability.

BACKGROUND

I. Procedural History

On April 5, 2004, a Santa Clara County jury, after deliberating two hours, found Petitioner guilty of aggravated sexual assault of a child under the age of fourteen who was ten or more years younger than Petitioner.  CT 164-66.  On October 21, 2004, the trial court sentenced Petitioner to fifteen years to life in state prison.  Petitioner appealed, asserting the Doyle violation claim.  On February 9, 2006, the California Court of Appeal affirmed the judgment.  Ex. 3, People v. Merino, 2006 WL 302642 (Cal. Ct. App. Feb. 9, 2006) (unpublished).  On April 19, 2006, the California Supreme Court summarily denied review.  Exs. 4, 5.

On June 6, 2007, Petitioner filed a petition for a writ of habeas corpus in the Superior Court, asserting claims of a Griffin violation and ineffective assistance of trial and appellate counsel.  Ex. 6.  On July 20, 2007, in a short written order, the court denied the petition.  Ex. 7.  Petitioner filed petitions for a writ of habeas corpus in the California Court of Appeal and California Supreme Court, which were summarily denied.  On July 8, 2008, Petitioner filed the instant petition.

II. Statement of Facts

The California Court of Appeal summarized the facts of this case as follows:

Prosecution Case

Defendant and his wife, H., had been married seven years and had two children, a six-year-old son and a four-year-old daughter (the child). On October 1, 2003, the family lived in a split-level house in San Jose. Defendant and H. had had an argument two days earlier and had not spoken to each other since that time. They had previously discussed divorce and resulting child custody issues. Each of them claimed that he or she would get custody of the children, and that the other one would not. Although the last time divorce was mentioned between them was six months before the most recent argument, H. decided after that argument to seek a divorce. At the time of the March 2004 trial, however, H. had not yet instituted divorce proceedings.

On the night of October 1, 2003, H. got the children ready for bed around 7:30 p.m. She then allowed them to watch cartoons in her son's bedroom on the third level of the house, while she watched television in a room on the first level. Defendant arrived home sometime between 8:30 and 9:00 p.m. A few minutes before then, H. went upstairs to tell the children that it was almost bedtime. The children were in their son's bed, awake. H. returned to the television room and was there when defendant entered the room from the garage. Defendant acted intoxicated, which was not unusual; he often came home intoxicated. He and H. did not speak to each other as he walked through the television room.

H. heard defendant enter the kitchen on the second level and prepare some food. She then heard their son talking. H. went into the kitchen and saw defendant and their son talking to each other. H. returned to the television room and defendant and their son went upstairs. H. could hear footsteps going in and out of the master bedroom overhead. She thought that the children were going in to see defendant and was concerned because defendant was intoxicated and thus short-tempered. Before the show she wanted to watch at 9:00 p.m. began, H. heard the child crying. H. went upstairs. She glanced into the master bedroom on her way to the children's rooms and saw defendant in bed and the television on. H. went first to their son's room, where she saw her son in his bed still watching television. She could hear the child's muffled crying, but she did not find the child in that room. She then went to the child's room, but the child was not there either. H. heard the child's muffled crying again, so she headed for the master bedroom. While still in the hall she heard defendant say, "'Shh, shh, shh, baby, just suck it.'" When H. entered the master bedroom she saw

3

defendant lying on his back in bed with the bedcovers over him, but she did not see the child.

H. asked defendant whether he knew where the child was. Defendant responded, "'Who.'"   H. heard the child crying and saw movement under the bed covers.  She also saw the child's pajama bottoms on the floor.  She pulled the bed covers back and saw the child on top of defendant with his penis in her mouth.  Defendant had his hand on the child's head.  The child pulled herself away and said "mommy, mommy."  H. saw that defendant's penis was erect.  She grabbed the child and said, "What are you doing, you God damn child molester." Defendant responded, "What?"  H. said, "I'm going to call the cops on you."  Defendant responded, "So what, go ahead."  H. took the child, who was naked from the waist down, and returned to the television room.

H. put the child in a recliner and wrapped her in a blanket, then got a phone book and called a rape crisis hotline.  She was told that if she wanted to file a report she needed to call the police.  She hung up and dialed 911.  Upset and not thinking clearly, she hung up.  She did not talk to their daughter about what had happened.  She heard defendant call out to their son to get him some food, and she heard their son getting the food.  The 911 operator called her back and H. told the operator what had happened.  FN3  In the middle of the call, which began at 9:13 p.m., H. asked the child, "Did Daddy touch you before, Baby?  He did that before?  He touched you?"  H. then told the operator that defendant "was under the covers, he had her under the covers and, he told her to do something, oh God."

> FN3 A tape of the 911 operator's call back to H. was admitted into evidence as exhibit 4 and was played for the jury.  A transcript of the tape, marked for identification as exhibit 4A, was provided to the jury during the playing of the tape, but was not admitted into evidence.

San Jose Police Officer George Chavez responded to defendant's address at 9:26 p.m. on October 1, 2003.  Officer Fontanilla was already there, talking to H., who was upset and crying.  Officer Chavez spoke to H. for 15 to 20 minutes. Later, both officers went upstairs and entered the master bedroom.  Defendant was lying in bed, awake, with a sheet over him.  The officers instructed defendant to dress, and then handcuffed him and took him into custody.  Defendant appeared to be intoxicated, but he did not appear to be upset, and he complied with the officers' instructions.  The parties stipulated that a sample of defendant's blood, which was taken at 11:00 p.m. on October 1, 2003, showed a blood-alcohol content of .19.

Officer Chavez secured the sheets from the bed in the master bedroom, but there were no obvious fluids on them.  The parties stipulated that the officers had the opportunity to

4

take penile swabs from defendant, but did not do so.  Just before leaving the house, Officer Chavez met the child in the lower level of the house.  H. sat next to the child while the officer asked the child two questions.  To the officer's question whether her daddy put anything in her mouth, the child responded, "yes . . . his penis."  To the officer's question whether her daddy had ever done this before, the child responded, "Lots of times."  Because the children used to take baths together, H. had previously told the child that boys have a penis and girls have a vagina.  Officer Chavez drove H. to meet with Detective Jon Kaiser.

Detective Kaiser met with H. at the witness interview center for about 30 minutes.  H. was visibly upset, and she broke down and sobbed on at least two occasions during her interview.  Detective Kaiser did not ask H. whether the child said something to her when she entered the master bedroom, and H. did not say that the child had cried out to her. Detective Kaiser interviewed defendant at the police department just before midnight on October 1, 2003.  FN4 Detective Kaiser interviewed the child on the afternoon of October 2, 2003, at the child interview center.  FN5  The child told Detective Kaiser that she had sucked on defendant's "vagina," and pointed to the genitalia area on a diagram of a clothed boy.

> FN4 Detective Kaiser did not testify that he informed defendant of his <u>Miranda</u> rights during the interview.

> FN5 The interview was videotaped. A DVD of the tape, People's exhibit 2, was played for the jury while they reviewed a transcript of the DVD, People's exhibit 2A. Exhibit 2A is not part of the record on appeal.

The child testified that boys use their penis to pee, but that she did not have a name for the body part that girls use.  She knows that somewhere on her body she has a vagina. She remembers that she talked to Detective Kaiser about defendant putting his penis in her mouth.  It happened in her parent's bedroom.  Defendant woke her up and took her from her room to the bed in his room.  He put her under the covers and put his hard penis in her mouth.  She did not want to do it and she cried.  She did not try to move away because she was afraid.  H. came into the room, grabbed her, took her downstairs, and called the police.  The police came and she talked to them.  Although defendant had done this before, she did not tell her mother that he had, and she did not know why.

The defense case

Ronald Meister, a licensed psychologist, testified as an expert in the areas of interviewing techniques and suggestibility.  He reviewed the taped interview of the child by Detective Kaiser, the transcript of the tape, the police reports, and the tape of the 911 call.  In his opinion,

assuming that the child was present at the beginning of the 911 call, the child's later interviews could have been influenced by what she heard.  The child could have believed that what she heard her mother say was true, and it could have affected her memory.  The questions Officer Chavez asked the child could have adversely affected subsequent interviews, because the officer was prompting the child rather than asking open-ended questions.  And, the diagrams Detective Kaiser presented the child at the start of his interview of her were suggestive introductory prompts.  The diagrams should not have been introduced until the child discussed what had happened from her own point of view.  Child interviewers should always be neutral in their approach to the child and to the alleged events.

Defendant testified in his own defense that his and H.'s marriage had been getting progressively worse.  They argued about money and his drinking, and, when discussing divorce, they argued about who would get custody of the children.  After their most recent argument, they did not speak to each other for a few days.

On the evening of October 1, 2003, defendant went out drinking after work with a fellow employee.  He stopped drinking around 8:15 p.m., and he arrived home close to 9:00 p.m.  As he walked through the television room, H. commented about his drinking and he told her that she would not have to worry about it once they divorced.  Defendant went into the kitchen and made himself something to eat.  Their son came down and they talked.  After about 10 or 15 minutes, they both went upstairs.

Defendant went into the master bedroom and their son went to his room.  Defendant did not see the child.  He got ready for bed.  His clock read 9:06 p.m., and he set the alarm for 5:06 a.m.  He turned on the television and got into bed.  The next thing he remembers is H. waking him up, asking whether he had seen the child.  He sat up and said, "what."  He then realized that the child was in his bed next to him, under the bedcovers.  He does not recall bringing the child into his room, and the child did not have her mouth on his penis.  He thinks that child molestation is the worst crime imaginable, and he would never have engaged in such behavior.  He is upset that he has been falsely accused.

H. said to the child, "Come on," "let's go."  H. did not make any accusations against him.  She did not appear upset or act as though he had done something wrong.  It was not unusual for the child to get into bed with him.  H. took the child by the hand and they walked out of the room.  Defendant called for their son to bring him some food from the kitchen.  Their son did so.  Defendant ate the food and went back to sleep. The next thing he remembers is police officers announcing their presence in his bedroom.  They told him that he was under arrest and that he was to get up.  He did not know what was going on, but he cooperated with the police.  He was

6

handcuffed and taken to the police station.  He did not learn
what he was arrested for until later that night when he was
interviewed by Detective Kaiser.

Ex. 3 at 2-7 (footnotes in original).

LEGAL STANDARD

A federal court may entertain a habeas petition from a state
prisoner "only on the ground that he is in custody in violation of
the Constitution or laws or treaties of the United States."  28
U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death
Penalty Act (AEDPA) of 1996, a district court may not grant habeas
relief unless the state court's adjudication of the claim:
"(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding."  28 U.S.C. § 2254(d); Williams v.
Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" Supreme Court
authority, that is, falls under the first clause of § 2254(d)(1),
only if "the state court arrives at a conclusion opposite to that
reached by [the Supreme] Court on a question of law or if the
state court decides a case differently than [the Supreme] Court
has on a set of materially indistinguishable facts."  Williams,
529 U.S. at 412-13.  A state court decision is an "unreasonable
application of" Supreme Court authority, under the second clause
of § 2254(d)(1), if it correctly identifies the governing legal
principle from the Supreme Court's decisions but "unreasonably
applies that principle to the facts of the prisoner's case."  Id.
at 413.  The federal court on habeas review may not issue the writ

"simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409. Under AEDPA, the writ may be granted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). A petitioner must present clear and convincing evidence to overcome the presumption of correctness under § 2254(e)(1); conclusory assertions will not do. Id.

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). In the present case, the highest court to issue a reasoned decision on the Doyle claim is the California Court of Appeal and the highest court to issue a reasoned decision on the ineffective assistance of counsel claims is the Superior Court. The Superior Court denied the Griffin claim on procedural grounds, which means that this Court

8

independently reviews the record to determine if the state court's rejection of the claim was objectively unreasonable.  See Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013).

DISCUSSION

I. Doyle Error

Petitioner argues that the prosecutor violated Doyle v Ohio by commenting on Petitioner's silence as an admission of guilt and by improperly cross-examining Petitioner about his silence.

A. Pre-Trial Events

After Petitioner was arrested, he was interviewed by Detective Jon Kaiser.  RT 463.  Before Detective Kaiser read Petitioner his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), he asked if Petitioner knew why he had been arrested. Petitioner responded that he did not.  Petitioner said he had "gotten into it" with his wife that night, and that the police came to arrest him while he was lying in bed.  CT 217.  Detective Kaiser noted Petitioner smelled like alcohol and Petitioner admitted he had been drinking.  CT 218.

Detective Kaiser then gave Petitioner the Miranda warning and stated, "Well, there's some allegations of some child molestation involving your daughter.  And they're pretty serious charges."  RT 453, 466; CT 219.  Petitioner responded, "Okay."  Detective Kaiser then asked if Petitioner had anything to say.  CT 219.  Petitioner said, "I have a lot to say, but uh . . ."  CT 219.  Detective Kaiser asked Petitioner to help him "understand why."  Petitioner stated, "Well, yeah, exactly.  Help me understand why.  The only thing I have to say is my wife is uh, help me understand, I mean we had an argument but, but, nothing, none of that precipitates this.  I mean, well, whatever, I mean I . . ."  CT 219.  Detective

9

United States District Court
For the Northern District of California

Kaiser then began questioning Petitioner about what time he got off work and what he did between the time he left work and got home that night.  CT 219-20.  At that time, Petitioner invoked his right to an attorney and the interview was terminated.  CT 219-20.

B. Trial Court Proceedings

1. Prosecutor's Opening Statement[2]

In his opening statement the prosecutor told the jury that, at the time the officers entered Petitioner's bedroom and roused him out of his bed, he did not question them about why they were there, what they were doing or what was going on.  RT 217-18. Defense counsel objected on the ground that this statement infringed on Petitioner's Fifth Amendment right to remain silent in that it commented on his silence.  Id.  The court indicated that the objection was not timely and defense counsel responded that his greater concern, since opening remarks are not evidence, was that the prosecutor not be allowed to introduce evidence of Petitioner's silence during the arrest process, as a potential violation of his Fifth Amendment rights.  The court ruled that the prosecutor could not introduce evidence of Petitioner's silence during the arrest.  RT 218-19.

2. Trial Proceedings

During trial, the prosecutor advised the court that he intended to cross-examine Petitioner about his statements to Detective Kaiser during the period after he was Mirandized but before he asked for counsel.  RT 440.  Defense counsel objected,

---

[2] The opening statements of counsel were not transcribed and are not part of the record submitted to this Court.  This section is taken from the trial court's summary of the prosecutor's opening remarks that were challenged by defense counsel.  RT 214, 217.

arguing that Petitioner's interim waiver of his <u>Miranda</u> rights was inadequate.  RT 440, 448.  The court ruled that Petitioner had implicitly waived his <u>Miranda</u> rights when he chose to talk to Detective Kaiser after being <u>Mirandized</u> and that Petitioner's statements after he waived his <u>Miranda</u> rights and before he requested counsel were admissible.  RT 454-56.  During trial, the prosecutor cross-examined Petitioner about his statements to Detective Kaiser as follows:

> Q: And after reading you your <u>Miranda</u> rights, he basically told you why you were at the police station?
>
> A: Yes, he did.
>
> Q: And, specifically what he said is there are allegations of child molestation involving [the child].
>
> A: Correct.
>
> Q: And he asked you if you had anything to say about that?
>
> A: That's correct.
>
> Q: And you didn't react, did you?
>
> A: Yes, I did.
>
> Q: How did you react?
>
> A: I believe I told him that those allegations, there's nothing——there would be no reasons why I should have allegations like that or some words to the effect.
>
> Q: You never said, "I didn't molest [the child]?"
>
> A: No, I did not.
>
> Q: You didn't get visibly upset when you heard you were being accused of molesting your biological daughter, did you?
>
> DEFENSE COUNSEL: Objection, calls for speculation.  If we could approach on that, Your Honor, I have a specific purpose for that.
>
> (A sidebar conference was held, not reported).
>
> THE COURT: . . . The objection . . . is sustained.

**United States District Court**
For the Northern District of California

PROSECUTOR: Mr. Merino, when you were informed that you were being accused of molesting your four-year-old biological daughter, the only thing you said is "I have a lot to say about this," fair to say?

A: Correct.

Q: You didn't expand on that?

A: No, I did not.

Q: Detective Kaiser didn't prevent you from expanding on that, did he?

A: No, he—

DEFENSE COUNSEL: Your Honor, I'm going to object.  May we approach?

THE COURT: Yes.

(A sidebar conference was held, not reported).

THE COURT: The objection is sustained.

RT 466-68.

Further along in Petitioner's cross-examination, the following exchange took place between the prosecutor and Petitioner:

Q: You indicated that if [H.] had called you a child molester and said she was going to call the police, military training or not, you would have protested and not done nothing, correct?

A: That's correct.

Q: Immediately after Detective Kaiser told you you were being accused of child molest, you basically did nothing, correct?

A: There is a big difference between being in a police station with Detective Kaiser there and being at home with my wife saying something crazy.  There is a huge difference.

Q: Well, you are right.  When you are at the police station, you are actually being accused of something criminally, correct?

A: Correct.

12

Q: That's actually more serious than your wife yelling at you?

DEFENSE COUNSEL: Objective, argumentative.  May we approach, Your Honor?

THE COURT: No.  The objection is sustained to the question as phrased.

Q: Mr. Merino, what do you take as more serious, your wife accusing you in a home situation or a police officer saying you are being accused criminally of molesting your daughter?

A: Which I would take as more offensive actually is my wife saying that because that would be sprung off——if she was going to say that, then it would go from her to he [sic] thinks, then to the police and so forth, so that would have rattled my cage right that second, I would guarantee you.

Q: Detective Kaiser saying that didn't rattle your cage immediately?

DEFENSE COUNSEL: Objection, misstates the evidence.

THE COURT: Overruled.

THE WITNESS: With Detective Kaiser saying that, he's been told that.  He's doing his job.  I had no fault with him doing his job.  We all have our missions to do.  This is a role we play.  Someone told him that.  It's not his fault he's in there accusing me.

Q: What I'm getting at——correct me if you have a different way of looking at things.  If I was accused of molesting my daughter, the first thing I would say immediately after being accused of that is no, I did not molest my daughter.

DEFENSE COUNSEL: Objection, testimonial.

PROSECUTOR: I can add to that question.

THE COURT: Why don't you rephrase the question.

Q: Why didn't you say immediately after being accused by Detective Kaiser, I didn't molest her?

A: I said, Detective Kaiser, I have got lots to say about that.

Q: That was the extent of it at that time, correct?

United States District Court
For the Northern District of California

A: At that time, he's doing his job.  I'm telling him that I have lots to say about that.

Q: Thank you.  I have nothing further.

RT 483-85.

In its rebuttal case, the prosecution called Detective Kaiser, who stated that Petitioner remained calm and did not appear agitated when Detective Kaiser told him he was being accused of molesting his daughter.  RT 488-89.

After the parties rested and the jury left the courtroom, the court noted for the record what was discussed during the sidebar conference when defense counsel objected to the prosecutor's question whether Detective Kaiser prevented Petitioner from expanding on his answer to the molestation charge.  The court noted that defense counsel objected on the ground that Petitioner terminated the interview shortly after being Mirandized by invoking his right to counsel, and that the prosecutor's question was an improper comment on his assertion of his right to remain silent.  RT 495-96.  The court noted it had cautioned the prosecutor that his questions "would have to be extremely specific and absolutely clear," but that "it was very clear to the court that in that particular line of inquiry, you had not crossed the line into the area of failing to speak or asserting a right to counsel."  RT 496.  The court stated that it had recognized that the prosecutor was trying to question Petitioner about his responses during the time between Petitioner's Miranda waiver and his invocation of his right to counsel.  RT 495-96.  The court noted that it sustained defense counsel's objection to the question because it "arguably to some minor degree touch[ed] on the questions of defendant's assertion of the privilege."  RT 496.

During the sidebar conference, the prosecutor had "showed the Court the area in the transcript which was quite early in the interview and several colloquies prior to the assertion of the privilege."  RT 496-97.

During jury instructions, the court included the following instruction: "If an objection was sustained to a question, do not guess what the answer might have been.  Do not speculate as to the reason for the objection.  Do not assume to be true any insinuation suggested by a question asked a witness.  A question is not evidence and may be considered only as it helps you to understand the answer."  RT 511.  The court also instructed with CALJIC No. 2.71.5:

> If you should find from the evidence that there was an occasion where the defendant, one, under circumstances which reasonably afforded him an opportunity to reply, two, failed to make a denial in the face of an accusation expressed directly at him or in his presence charging him with a crime for which the defendant is now on trial or tending to connect him with its commission, and, three, that he heard the accusation and understood its nature, then the circumstance of his silence on that occasion may be considered against him as indicating an admission that the accusation thus made was true.

> Evidence of an accusatory statement is not received for the purpose of showing its truth but only as it supplies meaning to the silence of the accused in the face of it.  Unless you find that the defendant's silence at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement.

RT 517-18.

3. Prosecutor's Closing Argument

In his closing argument, the prosecutor argued as evidence of guilt that Petitioner was not visibly upset at the time he was arrested and at the time he was told he had been arrested for molesting his own daughter.  RT 534; 547-48.

15

4. Motion for New Trial

After the jury rendered its guilty verdict, Petitioner moved for a new trial based on <u>Doyle</u> error.  RT 619.  The court denied the motion for the following reasons: (1) when considered in context, the prosecutor's questions on cross-examination were not meant as a commentary on Petitioner's assertion of his right to counsel, but rather were meant to highlight Petitioner's "absolute lack of reaction" to the news that he was being accused of molesting his daughter; (2) similarly, the questions on recross-examination were intended as impeachment of Petitioner's testimony on redirect examination that, had his wife accused him of molesting their daughter, he would have issued an immediate denial; and (3) the court sustained defense counsel's objection to a question that "appeared to have transgressed" to "some minor degree" in the area of <u>Doyle</u> error."  RT 645-48.

B. Court of Appeal Opinion

The Court of Appeal concluded that it was error for the court to have instructed the jury with CALJIC No. 2.71.5 because "the record showed that defendant's failure to reply in one situation was based upon his constitutional right to remain silent."  Ex. 3 at 12.  The Court of Appeal did not determine whether <u>Doyle</u> error occurred, but denied the claim on the ground that, "even if there was error, any error was clearly harmless beyond a reasonable doubt."  Id. at 12-13.  The Court of Appeal found the error to be harmless as follows:

> First, defendant initially waived his <u>Miranda</u> rights and spoke to Detective Kaiser after he was arrested, thus the prosecutor could properly question defendant about his responses to Detective Kaiser's initial questions.  Defense counsel failed to object to most of the questions the prosecutor asked defendant regarding his responses to

United States District Court

For the Northern District of California

Detective Kaiser's questions, and the court sustained the one objection that counsel did raise.  In addition, the prosecutor's questions about defendant's responses were brief, and there is no indication that defendant's later invocation of his right to remain silent was mentioned in the prosecutor's argument.  The child testified that defendant took her to his room, put her under the bed covers, and put his hard penis in her mouth.  She did not want to do it and she cried.  She also testified that defendant had done this before, but that she did not tell her mother that he had.  H. testified that she heard the child's muffled crying, and found the child under the bed covers with defendant's penis in her mouth.  In the child's presence, H. told the 911 operator what had happened.  Defendant did not dispute that his daughter was in bed with him, but testified that he does not recall bringing the child into his room and that it was not unusual for the child to get into bed with him.  He also testified that he would never have molested his child, that he told Detective Kaiser that there would be no reasons for the allegations, and that he is upset about being falsely accused.  The defense expert testified that the child's memory of what happened could have been affected by what she heard her mother say on the telephone and by subsequent interviews.  The jury deliberated only two hours before reaching its guilty verdict, necessarily determining the issue of credibility in favor of the child and H. rather than defendant.  On the record before us we conclude that it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty even absent the alleged Doyle error.

Ex. 3 at 13.

C. Federal Authority

To protect the right to remain silent, a defendant's silence "at the time of arrest and after receiving Miranda warnings" cannot be used to impeach him should he choose to testify at trial.  Doyle v. Ohio, 426 U.S. 610, 619 (1976).  But "the Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest, Jenkins v. Anderson, 447 U.S. 231, 239 (1980), or after arrest if no Miranda warnings are given, Fletcher v. Weir, 455 U.S. 603, 606-607 (1982) (per curiam)."  Brecht v. Abrahamson, 507 U.S. 619, 628 (1993).  If a defendant voluntarily speaks after receiving Miranda warnings,

<u>Doyle</u> does not apply because the defendant has not remained silent. <u>Anderson v. Charles</u>, 447 U.S. 404, 408 (1980).  Likewise, pre-arrest, pre-<u>Miranda</u> silence may be used as substantive evidence of guilt. <u>United States v. Oplinger</u>, 150 F.3d 1061, 1066-67 (9th Cir. 1998) (bank employee's Fifth Amendment and due process rights not violated by prosecution's comments on employee's silence in response to employer's accusations of criminal conduct).  No <u>Doyle</u> violation occurs if the district court promptly sustains a timely objection to a question concerning post-arrest or post-<u>Miranda</u> silence, instructs the jury to disregard the question and gives a curative jury instruction. <u>United States v. Lopez</u>, 500 F.3d 840, 844 (9th Cir. 2006).

Overbroad questioning and closing argument that encompass post-arrest/pre-<u>Miranda</u>, as well as post-<u>Miranda</u>, silence may violate <u>Doyle</u>.  <u>Id.</u> (<u>Doyle</u> error occurred when prosecutor asked defendant whether he ever mentioned his excuse to a border patrol agent because defendant had been processed and given <u>Miranda</u> rights by that agent; the questioning covered permissible and impermissible periods).

D. Analysis

Respondent argues that no <u>Doyle</u> error occurred because all of the prosecutor's questions Petitioner challenges properly referred to the short time period after Petitioner waived his <u>Miranda</u> rights and before he invoked his right to an attorney.  The following factors weigh in favor of finding <u>Doyle</u> error.

In <u>Lopez</u>, the court held that the prosecutor's questions violated <u>Doyle</u>.  <u>Id.</u>  The court explained its ruling as follows:

The [prosecutor's] inquiries regarding what Lopez failed to tell Harrington violated <u>Doyle</u>, because Lopez's contact with

United States District Court
For the Northern District of California

Harrington encompassed both pre-Miranda and post-Miranda periods.  By drawing attention to the fact that Lopez "never" mentioned the alleged threats to Harrington, the prosecutor implicated Lopez's silence both pre-Miranda and post-Miranda. "Even if counsel for the government intended his comments to refer only to the post-arrest/pre-Miranda silence, the actual language used contains no such limitation and it is highly doubtful that the jury understood any such limitation."

Id. (citing United States v. Baker, 999 F.2d 412, 415 (9th Cir. 1993).

The situation here is similar to that in Lopez.  For instance, in his first line of questioning, the prosecutor asked Petitioner, "You never said, 'I didn't molest [the child].'" Petitioner responded, "No, I did not."  As in Lopez, the jury would not have known that the prosecutor was referring only to the brief period of time before Petitioner invoked his right to an attorney.  The prosecutor also asked Petitioner to confirm that he only said "I have a lot to say about this," after he was informed that he was accused of molesting his daughter, and Petitioner replied, "Yes."  The prosecutor then asked, "You didn't expand on that?" and Petitioner replied, "No, I did not."  Again, the jury would have no way of knowing that the prosecutor was referring only to the short span of time between Petitioner's Miranda waiver and his request for an attorney.  The prosecutor also asked, "Why didn't you say immediately after being accused by Detective Kaiser, I didn't molest her?" and Petitioner responded that he said "I have got lots to say about that."  Although, in asking this question, the prosecutor was careful to include the time frame, "immediately after being accused by Detective Kaiser," the jury would not have understood the short period of time to which the prosecutor was referring and would not know that immediately after answering this question, Petitioner invoked his right to an

19

attorney.  See Baker, 999 F.2d at 415 ("The government suggests
that because it argued to the court that its comments were
addressing post-arrest/pre-Miranda silence, it was clear that the
jury understood this limitation.  Without an explanation of
Miranda and a limiting instruction from the court, there is no
reason to believe the jury understood the narrow grounds on which
counsel's statements may have been permissible.").

The second factor weighing in favor of finding error is the
trial court's instructing the jury with CALJIC No. 2.71.5,
indicating that silence in the face of an accusation is evidence
of guilt.  The note to this instruction indicates that it "must
not be given in a situation where failure to reply is based upon
defendant's constitutional right to remain silent."  As noted by
the Court of Appeal, Petitioner's failure to reply, during part of
the questioning, was based on his constitutional right to remain
silent.

The following factors weigh in favor of finding no Doyle
error.  First, defense counsel objected to many of the
prosecutor's improper questions and the trial court sustained most
of the objections.  Although the trial court did not immediately
give curative instructions, it instructed the jury at the end of
the trial that, if an objection was sustained, the jury should not
speculate about the answer or consider the question.  Under Lopez,
500 F.3d at 844, the sustained objection and the curative
instruction at the end of the trial arguably cured any
prosecutorial misconduct in asking the question.  See also Greer
v. Miller, 483 U.S. 756, 766 n.8 (1987) (when curative instruction
is issued, court presumes that jury has disregarded inadmissible
evidence and that no due process violation occurred).

Second, contrary to Petitioner's contention, the prosecutor's brief references, in his closing argument, to Petitioner's demeanor at the time of his arrest and during the interview did not implicate Petitioner's right to remain silent.

Third, case law supports the trial court's ruling that Petitioner could be questioned about what he said during the brief time period between his Miranda waiver and his request for an attorney.  See Anderson, 447 U.S. at 408 (Doyle does not apply to defendant's voluntary statements after he receives Miranda warning).

The Court of Appeal was not unreasonable in its finding that the question of Doyle error did not have to be resolved because, even if an error occurred, no prejudice resulted.

The California Court of Appeal found no prejudice pursuant to Chapman v. California, 386 U.S. 18, 24 (1967), under which the inquiry is: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" Petitioner, applying the Chapman standard, argues that there was prejudice as a result of Doyle error.  However, in federal habeas proceedings, the more lenient Brecht standard for prejudice is applied, which requires the court to determine whether the error had a substantial and injurious effect or influence in determining the jury's verdict.  Brecht, 507 U.S. at 638.  There was no prejudice under Brecht for the following reasons.

First, Petitioner waived his Miranda rights by continuing to talk to Detective Kaiser after he was given the Miranda admonition and, thus, the prosecutor properly could question Petitioner about his responses during the short time between the Miranda warning and Petitioner's invocation of his right to an attorney.  Second,

United States District Court
For the Northern District of California

defense counsel objected to some of the prosecutor's improper questions, and the trial court sustained most of these objections and gave a curative instruction at the end of the trial.  Third, in his closing argument, the prosecutor did not make any improper comments about Petitioner's silence.  Fourth, defense counsel explained the following to the jury in his closing argument:

> Under the law, [Petitioner] doesn't have to say a word and he says a few words.  The fact that there is no additional statement, you should not speculate about that whatsoever. Now I know there is going to be a strong tendency on your part to do that.  I don't blame you.  I understand that. But, you have to say hey, you know what, that's the rule and we can't look into that. . . . So, you should not in any way say well, he didn't explain it more beyond that.  Because under the law he's not required to.  So just if you will please do your duty as jurors and not get into guessing about why didn't he say that, why didn't he say that, because he's not required to.

RT 579.

Finally, and most important, the evidence against Petitioner was strong.  The child testified that Petitioner took her into his room, put her under the bed covers, and put his penis in her mouth.  She did not want to do it and she cried.  RT 234-40.  Her description of these events did not noticeably change from her interview with police officers and with Detective Kaiser.  For the most part, H.'s testimony corroborated that of the child.  H. testified that she heard the child's muffled crying and found the child in Petitioner's bed, under the bed covers, with Petitioner's hard penis in her mouth.  RT 133-40.  Petitioner did not dispute that the child was in bed with him, but testified that he did not recall bringing her into his room and that it was not unusual for the child to get into bed with him.  He also testified that he did not molest the child and that he was upset about being falsely

accused.  He presented expert testimony that the child's memory of
what happened could have been affected by what she heard her
mother say, first on the telephone to the 911 operator and then to
the police when they arrived at the house.

Thus, the primary issue before the jury was credibility.
That the jury deliberated only two hours before reaching a guilty
verdict is an indication that the prosecutor's case was strong and
that the jury found the child and H. were credible and Petitioner
was not.  See Lopez, 500 F.3d at 846 ("Longer jury deliberations
weigh against a finding of harmless error because lengthy
deliberations suggest a difficult case."); United States v.
Velarde-Gomez, 269 F.3d 1023, 1036 (9th Cir. 2001)(jury's
deliberation for two-and-one-half hours on illegal reentry case
suggested any error in allowing testimony or commentary on
defendant's post-arrest silence was harmless).

Petitioner's argument that the prosecutor's case was weak is
not persuasive.  First, his argument based upon the lack of
physical evidence such as the child's saliva on his penis or body
fluids on the sheets is not persuasive.  Because the police failed
to collect this evidence does not mean it did not exist.  Also,
the police's failure to collect physical evidence does not negate
the credible testimony of the child and H.

Second, Petitioner's contention that H. was a biased witness
who was motivated by financial considerations and her desire to
obtain custody of the children, is belied by the record.  H.
testified to the following:

Petitioner was the financial provider for the family and H.
was a stay-at-home mom.  RT 150.  Before the charged offense
occurred, H. had been thinking about divorce but she decided to

United States District Court

For the Northern District of California

put it off for a couple of months because Petitioner had the opportunity to open his own business and if she waited until that happened she could probably get more support money for the children and herself. RT 127. Before Petitioner was arrested, H. was living in a four bedroom split-level home and, after his arrest, she was living in a one bedroom apartment with her two children. RT 150-51. H. was taking classes so that she could qualify for a job because Petitioner could no longer financially support the family. RT 151.

The evidence that H. was worse off financially after Petitioner's arrest undermines his argument that H. lied for financial gain. H. had no financial reason to lie because she knew that, in a few months, Petitioner would be making more money which meant she would be better off financially in the future than on the day she reported Petitioner's offense to the police.

Petitioner also argues that H. lied so that she would be awarded custody of the children. H. testified that, although both she and Petitioner wanted sole custody of the children in the event they divorced, she thought she would be granted custody because, as a stay-at-home mom, she spent the most time with the children. RT 154. This shows H. would have no reason to accuse Petitioner of child molestation to obtain custody of the children.

Petitioner also argues the child's story is not true because her bed looked like she had not slept in it but she testified that Petitioner woke her up from sleeping in her bed to take her into his bedroom. However, Petitioner did not dispute that H. found the child under the covers in his bed. Whether she was asleep in her bed before she came to be in Petitioner's bed is not relevant because it is undisputed that she was in Petitioner's bed.

Therefore, Petitioner's argument that the prosecutor's case was weak is belied by the record showing that the evidence against him was strong.

For all the above reasons, any <u>Doyle</u> error did not have a substantial and injurious effect or influence in determining the jury's verdict.  Accordingly, the California Court of Appeal's denial of this claim was not objectively unreasonable.  Habeas relief is denied.

II. <u>Griffin</u> Error

Petitioner contends that his due process rights were violated under <u>Griffin v. California</u>, 380 U.S. 609 (1965) because the trial court allowed the prosecutor to question him about his post-<u>Miranda</u> silence and gave CALJIC No. 2.71.5, which instructed the jury that it could consider his post-<u>Miranda</u> silence as an admission of guilt.

A. Trial Court Proceedings

Defense counsel objected to the court giving CALJIC No. 2.71.5.  RT 502.  The trial court stated that the instruction was applicable to Petitioner's failure to deny his wife's accusation that he was a child molester and to his failure to deny Detective Kaiser's accusation of child molestation.  RT 503.  Defense counsel conceded the instruction was applicable to the situation with Petitioner's wife, but argued it was not applicable to the situation with Detective Kaiser because Petitioner was beginning to deny it, but then changed his mind and invoked <u>Miranda</u>. Defense counsel argued that Petitioner's response to Detective Kaiser could not be considered an adoptive admission and because Petitioner was in the process of invoking <u>Miranda</u>, the instruction

"invites Griffin error."  The trial court rejected counsel's

arguments and instructed with CALJIC No. 2.71.5.  RT 507-09.

B. Federal Authority

In Griffin v. California, the Supreme Court held it was a

violation of the defendant's right against self-incrimination for

the trial court or prosecutor to comment on the defendant's

failure to testify.  380 U.S. at 615.  However, even if the

prosecutor's statements violate Griffin, "[r]eversal is warranted

only where such comment is extensive, where an inference of guilt

from silence is stressed to the jury as a basis for the

conviction, and where there is evidence that could have supported

acquittal."  Hovey v. Ayers, 458 F.3d 892, 912 (9th Cir. 2006)

(quotation and citation omitted).

C. Analysis

Petitioner raised this claim in his habeas petition in the

Superior Court which denied it on the procedural ground that

Petitioner could have, but did not, bring it up on direct appeal.

Ex. 7 at 1.  Respondent does not argue that this claim is

procedurally defaulted.  Therefore, this Court independently

reviews the record to determine if the state courts' rejection of

this claim was objectively unreasonable.

Griffin error addresses a situation where the defendant's

decision not to testify is adversely commented upon by the court

or prosecutor.  Here, Petitioner testified.  Thus, no Griffin

error occurred.  Even if Griffin is interpreted as meaning the

prosecutor cannot comment on Petitioner's silence, the claim would

still fail.  As discussed above, the prosecutor's closing

statements challenged by Petitioner have to do with Petitioner's

demeanor when he was arrested and when he learned that he was

being accused of child molestation.  The comments on Petitioner's
demeanor do not implicate Griffin because they are not about
Petitioner's silence.

If Griffin is extended to apply to the court's giving CALJIC
No. 2.71.5, the claim fails for the same reason discussed above in
relation to the Doyle claim, which is that, even if it was error
to give this instruction, the error did not have a substantial and
injurious effect or influence in determining the jury's verdict.

Petitioner cites Malloy v. Hogan, 378 U.S. 1 (1964), in
support of his argument.  Petition, Attachment A at 8.  Malloy is
not applicable because it did not address a Griffin claim.  It
held that the petitioner, who was a witness in a state criminal
proceeding, was protected by the Fifth and Fourteenth Amendments
from providing testimony that might furnish a link in a chain of
evidence that might incriminate him.  Id. at 11-14.  In his
traverse, Petitioner cites other cases that address jury
instructions in general, but not CALJIC No. 2.71.5, and that do
not pertain to Griffin error.  Therefore, none of the cases
Petitioner cites supports his claim of Griffin error.

Accordingly, the Court concludes that no Griffin error
occurred.  Habeas relief on this claim is denied.

III. Ineffective Assistance of Trial and Appellate Counsel

Petitioner contends that trial counsel was ineffective
because he should have timely objected to the prosecutor's
opening-statement reference to Petitioner's post-arrest silence
and he should have objected to the prosecutor's follow-up
questions regarding Petitioner's post-Miranda silence.  Petitioner
contends that appellate counsel was ineffective because he failed
to raise a claim of Griffin error on direct appeal.

A. Federal Authority

    1. Trial Counsel

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.  "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 131 S. Ct. 770, 792 (2011) (citing Strickland, 466 U.S. at 693).

    2. Appellate Counsel

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland v. Washington, 466 U.S. 668 (1984).  Smith v. Robbins, 528 U.S. 259, 285 (2000).  First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue.  Id.  Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a

United States District Court
For the Northern District of California

reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal.  Id.  Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant. Jones v. Barnes, 463 U.S. 745, 751-54 (1983).  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989).  Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason—because he declined to raise a weak issue.  Id.

B. Analysis

Petitioner raised this claim in his state habeas petitions. A written decision was issued only by the Superior Court.  The Superior Court denied the claim pertaining to trial counsel on the ground that Petitioner had failed to show that he received ineffective assistance.  Ex. 7 at 2.  It denied the claim pertaining to appellate counsel on the ground that it was, in effect, a challenge to the CALJIC No. 2.71.5 instruction, which the Court of Appeal had considered on direct appeal and held that, although the instruction was given in error, it was harmless in Petitioner's case.  Id.

The Superior Court's denial of these ineffective assistance claims was not objectively unreasonable.  Trial counsel's objection to the prosecutor's improper opening-statement reference to Petitioner's silence immediately after his arrest was untimely. However, as counsel recognized, the prosecutor's opening statement was not evidence and counsel was more concerned with the prosecutor introducing during the trial evidence of Petitioner's

post-arrest silence.  In response to counsel's objection, the court ruled that the prosecutor could not introduce evidence of Petitioner's silence during his arrest.  RT 218-19.  Thus, although counsel's objection to the prosecutor's opening remarks was untimely, counsel's more important objection to the prosecutor's introducing evidence of Petitioner's silence during his arrest was timely and successful.

Further, as revealed in the excerpts of the record cited in connection with Petitioner's claim of Doyle error, during Petitioner's cross-examination, defense counsel objected five times to the prosecutor's questions that infringed upon Petitioner's right to remain silent.  Counsel did not object to the question, "Why didn't you say immediately after being accused by Detective Kaiser, I didn't molest her," because the prosecutor, by including the phrase, "immediately after being accused by Detective Kaiser," limited his question to the short period of time after Petitioner waived his Miranda rights and before he invoked his right to an attorney.  The trial court had previously ruled that the prosecutor could question Petitioner about his statements during this time period.  Thus, if counsel had objected to this question, the objection would have been overruled.  Counsel cannot be faulted for failing to make a futile objection.  See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) (counsel's performance cannot be deemed deficient for failing to make a meritless objection or failing to take a futile action).

In regard to appellate counsel, the Court has concluded above that there was no Griffin error.  Therefore, appellate counsel's failure to include a Griffin claim on direct appeal does not constitute deficient performance.  See Miller, 882 F.2d at 1434

**United States District Court**
For the Northern District of California

1  (declining to raise a weak issue on appeal does not constitute

2  deficient performance).

3      Accordingly, neither trial nor appellate counsel performed

4  ineffectively.  Habeas relief on this claim is not warranted.

5  IV. Prosecutorial Misconduct

6      In his amended petition, citing People v. Uribe, 162 Cal.

7  App. 4th 1457 (2008), Petitioner claims the prosecutor committed

8  misconduct by suppressing a videotape of the Sexual Assault

9  Response Team (SART) examination of the child which allegedly was

10  conducted within hours of the assault and which allegedly would

   have provided exculpatory evidence.[3]

11      A. Factual Background

12      As discussed above, at trial, the primary evidence against

13  Petitioner was the testimony of H. and the child.  Both of them

14  testified that Petitioner forced the child to orally copulate him

15  while he lay in his bed.  No physical evidence was submitted by

16  the prosecution or defense.  Sheets seized from Petitioner's bed

17  were not tested for bodily fluids and Petitioner's penis was not

18  swabbed after he was arrested.  There was no evidence that the

19  child was physically examined after the incident.

20      In his rebuttal closing argument, the prosecutor made the

21  following remarks in response to defense counsel's argument that

22  the prosecutor presented no physical evidence of a sexual assault:

23  "There was no examination of [the child's] body that was brought

24

25      [3] Petitioner asserts two claims: (1) prosecutorial misconduct
26  for the suppression of material evidence; and (2) violation of
    Brady v. Maryland.  Because a Brady violation is the same as a
27  claim of prosecutorial misconduct for the suppression of evidence,
    the Court addresses them as one claim.
28

into evidence.  And nobody is alleging that the defendant penetrated [the child] in any way or did anything like that.  So you wouldn't expect anything from a medical exam."  RT 595-96.

After Petitioner filed his federal habeas petition, the California Court of Appeal issued its opinion in People v. Uribe, 162 Cal. App. 4th 1457 (2008), which found that a videotape of the victim's SART examination was favorable evidence for the defense and held that the failure to produce the video of the SART exam constituted a Brady violation.  Id. at 1475, 1479, 1482.  To find that the videotape was material within the meaning of Brady, the court relied heavily on the fact that the case against the defendant was weak.  Id. at 1482.

On the basis of Uribe, Petitioner filed a petition for a writ of habeas corpus in the state Superior Court asserting that the prosecutor in his case withheld exculpatory evidence of a videotape of the child's SART examination.  The Superior Court denied the petition, as follows:[4]

> In the aftermath of the Uribe case, the District Attorney has begun retrieval and examination of all the SART videotapes that may support claims such as Petitioner has made.  The tapes are being provided to the Public Defender who will be bringing motions or petitions to reopen cases when appropriate.  It is only when such a motion is justified by a review of the SART tape at issue that Superior Court involvement becomes justified.  The Superior Court cannot issue orders to show cause, in the hundreds of cases in question, without a preliminary determination by the attorneys who have viewed the evidence that action is warranted.  Accordingly, petitioner's claim on this point is denied without prejudice.  Petitioner may contact the offices of the District Attorney or Public Defender for further information.

---

[4] Petitioner submitted only the first page of the Superior Court order.  Respondent quotes the entire two-page order, which is cited here.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

In re Merino, No. CC328533 (Santa Clara Co. Sup. Ct. Aug. 3, 2010).

The California Court of Appeal and Supreme Court summarily denied Petitioner's petitions. Pet'r's Appx. 2, 3. This Court reviews the decision of the Superior Court as the last reasoned state court decision.

A. Federal Authority

In order to succeed under Brady v. Maryland, 373 U.S. 83 (1963), a petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material. Banks v. Dretke, 540 U.S. 668, 691 (2004).

Under Brady, that evidence was "material" is the same as that lack of it was "prejudicial." United States v. Kohring, 637 F.3d 895, 902 n.1 (9th Cir. 2011). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469-70 (2009). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'" Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). However, the mere possibility that undisclosed information might have been helpful to the defense or might have affected the outcome of the trial does not establish materiality under Brady. United States v. Olsen, 704 F.3d 1172, 1184 (9th Cir. 2013).

B. Analysis

In his amended petition, Petitioner refers to a letter dated November 2009 from the Santa Clara Public Defender's Office informing him that his case was under review pursuant to the <u>Uribe</u> decision and that the office would represent him should his case come within the purview of that decision.  Amend. Pet. at 6.  In his traverse, Petitioner attaches additional letters.  Exhibit A is a December 9, 2009 letter from the Public Defender's office indicating it was in the initial evaluation process of Petitioner's case, including attempting to obtain his file from his private attorney who defended him.  Exhibit B consists of two letters: (1) a February 10, 2010 letter from the Public Defender's office to Petitioner's former defense attorney requesting Petitioner's trial file for the Public Defender's review pursuant to the <u>People v. Uribe</u> decision and (2) a September 24, 2010 letter from the Public Defender's office to Petitioner informing him that the Public Defender could not send him a copy of the SART examination photographs or videotape because it depicted naked images of a child.  Petitioner was advised to contact the District Attorney's Office which would release the material to a legitimate medical expert, but not to Petitioner directly.  Exhibit C is a February 26, 2010 letter from the Public Defender's office to Petitioner indicating that it was enclosing a copy of the "relevant" SART report, with the names of victims or witnesses redacted.

These letters appear to support Petitioner's contention that a SART examination was conducted of the child and that there is a videotape of that examination.  However, they do not support his contention that the examination or the videotape of the

United States District Court
For the Northern District of California

examination would provide material exculpatory evidence.  It is noteworthy that the February 26, 2010 letter indicates that the Public Defender's office provided to Petitioner a copy of the relevant SART report, but that Petitioner did not submit a copy of the report with his amended petition.  From this, it can be inferred that the report does not provide exculpatory evidence because, if it did, Petitioner would have submitted it in support of his petition.

In his amended petition, Petitioner argues, because the SART exam was conducted within hours of the alleged assault, "There was no time for any healing of any injuries.  The absence of bruising, tearing, or any abrasions would be favorable and exculpatory for the defense."  Am. Pet. at 3.  However, the type of crime that was committed, oral copulation by the child, would most likely not have produced any injuries, bruising, tearing or marks on the child's body.  Thus, the absence of such evidence is not exculpatory.

Petitioner also argues that the SART videotape would be material because the prosecutor's case against him was weak.  He bases this claim on the same arguments he gave in support of his claim of <u>Doyle</u> error.  However, as discussed above, Petitioner's argument that the case against him was weak is unpersuasive.

Therefore, the Superior Court's denial of the <u>Brady</u> claim was not objectively unreasonable.[5]

---

[5]It is also noted that the Court of Appeal denied the petition without prejudice should the Public Defender's office find that the videotape of the child's SART examination was material.

United States District Court
For the Northern District of California

In his amended petition, Petitioner also asserts a claim of ineffective assistance of trial and appellate counsel based on their failure to discover the SART videotape. However, because the Court has found no <u>Brady</u> violation, the ineffective assistance of counsel claim fails because Petitioner cannot show prejudice.

V. Evidentiary Hearing

Petitioner requests an evidentiary hearing and appointment of counsel to discover the full impact of the SART videotape. Am. Pet. at 8. Petitioner is entitled to an evidentiary hearing on disputed facts if his allegations, if proven, would entitle him to relief. <u>Perez v. Rosario</u>, 459 F.3d 943, 954 n.5 (9th Cir. 2006); <u>Williams v. Calderon</u>, 52 F.3d 1465, 1484 (9th Cir. 1995).

An evidentiary hearing is not required. As discussed above, Petitioner has not shown the videotape contains material exculpatory evidence and the record establishes that it is unlikely that it does. Furthermore, Petitioner is protected by the procedure put in place by the state courts requiring the Public Defender's office to review SART videotapes and to submit in state court a motion to reopen a case, where it is warranted. Accordingly, Petitioner's request for an evidentiary hearing is denied. <u>See</u> <u>Tejada v. Dugger</u>, 941 F.2d 1551, 1559 (11th Cir. 1991) (no hearing required if allegations, viewed against the record, fail to state a claim for relief).

VI. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

United States District Court

For the Northern District of California

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues satisfy this standard.  28 U.S.C. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists could find its ruling on the claim of Doyle error debatable or wrong.  Therefore, a certificate of appealability is granted on this claim only.

Petitioner may not appeal the denial of a certificate of appealability on his other claims in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254 Cases.

CONCLUSION

Based on the foregoing, the Court orders as follows:

1. The petition for a writ of habeas corpus is denied.

2. A certificate of appealability is granted on the claim of Doyle error and denied on all other claims.

3. The request for an evidentiary hearing is denied.

1       4. The Clerk of the Court shall enter a separate judgment and

2 close the file.

3       IT IS SO ORDERED.

Dated: 6/30/2014

_____
CLAUDIA WILKEN
UNITED STATES DISTRICT JUDGE